Your Honour, the first case of the morning is called 10-032, Cambridge and Countryside Homeowners Association v. City of Aurora. On behalf of the Adelaide, Mr. Mark Schmidt. On behalf of the Adelaide, Mr. James Fessler. Good morning, Counsel. Mr. Schmidt. Your Honour, Mr. Clerk, Mr. Bailiff, Counsel. This is an appeal of a decision returned after a bench trial. This appeal concerns the interpretation of a document known as the Maintenance Expense Cost Sharing Agreement. It's been referred to throughout the pleadings as the MECSA. It also concerns the application of the Local Government Prompt Payment Act and issues concerning the conduct of the trial. Jurisdictions predicated on Supreme Court Rules 301 and 303. In order to encourage the completion of a partially completed subdivision, the City of Aurora and DRH Cambridge, the predecessor in interest to our client, entered into several agreements, including the MECSA. In exchange for DRH Cambridge agreeing to, among other things, complete certain improvements to the infrastructure and to establish a homeowner's association to maintain them in the future, the City of Aurora agreed to pay 47% of the homeowner association costs. The theories of the homeowner's association that we're bringing before the Court today include breach of contract specific performance, I'm sorry, that we brought at the trial, declaratory judgment, fraud, and a violation of the Local Government Prompt Payment Act. Counsel? Yes. If I may interrupt, you mentioned the bench trial and there was no copy of the MECSA with Exhibit B that was introduced at this bench trial, was there? No, there was not, Your Honor. There was testimony that Plaintiff's Exhibit 2A is in fact the Exhibit B. But no one could testify or no one testified unequivocally that that was what Exhibit B was? Unequivocally, no, Your Honor. Okay. I don't believe that's the burden that we bore at the trial. You argue in your brief that because of the language in the MECSA that all exhibits are incorporated by reference, whether attached at the time of execution or prepared later in accordance with the agreement, is important, correct? Do you rely on that language? It's in the language of the MECSA, Your Honor, and we do. And we just, you've indicated that really there was no Exhibit B, or do you concede there was no Exhibit B attached at execution? There was no, that I do not concede, Your Honor. And in support of that would be Mr. Hinterlong's testimony that when he was on the city council, in one and only one instance, did he sign a document without all exhibits attached, and he described that incident as not being involved in this case. All right. But let me ask you this question. What version of the stabilized budget, either the November 30th, 1999, December 1st, 1999, or December 20th, 1999, was prepared later than the execution of the agreement on January 11th, 2000? Your Honor, I don't believe any of them were. All right. So you're not relying on that section of the language to say that Exhibit B was, or Plaintiffs 2 was Exhibit B? Well, in terms of reliance, Your Honor, it may have been attached later. They were drafted before, whether. No, but the language doesn't say attached later. It says prepared later. It doesn't say attached later. The language says prepared later. It says attached at execution or prepared later. Your Honor, I'm sorry. I don't know how to answer the Court's question. Okay. Well, you were relying on the fact that this language was important to establish that the stabilized budget was this Exhibit B. That's correct, Your Honor. So you're saying it's because of the testimony of this alderman who said that he wouldn't have voted for this agreement unless it were attached, and that's what you're relying on? He didn't say that, Your Honor. I'm relying on 20 different points, all of which are relevant and all of which support the fact that our Exhibit 2A is, in fact, the Exhibit B to the maximum. And I can list them quickly if the Court wants. Well, I mean, I've read all of them in the brief. I was focusing on the one relating to the language that you cited, that part of the argument. But go ahead. I want to belabor this point. Okay. Our argument, Your Honor, is whether or not attached before or after doesn't matter because the MEXA would allow for it to have been later drafted and attached. And how would the – I'm sorry. Then let's just stay on this for a minute. How would the MEXA have later allowed for it to have been drafted later and attached? I believe that's the language. What language is there in the agreement? I believe that's the language of the agreement, Your Honor. All right. Well, maybe during the break you can check and point it out to me when you come back then. Your Honor. The trial court found that there was no Exhibit B. Yes. Are we looking at that for Manifest Laid? Are we reviewing that? Is the standard of review on that point whether that finding is against the Manifest Laid or not? That is the standard, I believe, Your Honor. And I would simply point out that there are 20 different instances where there is some evidence which indicates that Exhibit 2A is in fact Exhibit B. There's nothing with respect to the trial court to support the conclusion that it was an exhibit to show the boundaries. There's simply no support of that. What about the plain language of the MEXA and the development agreement supporting that? The language did not say only these categories. It said including these categories. But it didn't say including but not limited to, did it? That's correct, Your Honor. It did not. But if I could just briefly list them. MEXA identified the same core number, 217,560, as the exhibit that we identify as Exhibit B. Mr. Conrad made a notation that he presented that exhibit to the Finance Committee. There was a memo talking about the need to include this and other reserve items, what have been described generically as administrative expenses, prior to the drafting and presentation of this to the Finance Committee. The notation, as I said, that there was a notation on Mr. Conrad's copy that it was presented to the Finance Committee. And Mr. Conrad testified that the Finance Committee asked questions about that particular exhibit. The two exhibits prepared by the defense, or I'm sorry, submitted by the defense during the trial, had breakdowns for cost sharing, whereas your 2B did not, correct? Your Honor, I rely on the fact, one, that I believe, well, it's not argued by us, but I believe there's a plural evidence question there. There was no affirmative testimony that either of those exhibits were in fact 2B. They were simply put in. The court suggested they were for purposes of impeachment, the trial court. But there was never any affirmative testimony that those documents, in fact, represented Exhibit 2B. And- Exhibit B. I'm sorry, Exhibit B. That's correct. Going on, in terms of the payments that were made pursuant to categories which were found on Exhibit B, two payments were made. They included the categories that were in dispute. They were made. They were made without dispute. Mr. Caputo and Mr. de León testified that if there had been an error in these payments, two things would have happened. There would have been some kind of notation made in the employment file of the person who made those payments, and they were looked at both by a supervisor and by a clerk. And secondly, there would have been an investigation. But there was nothing in the language of the MEXA or the development agreement that referred to administrative expenses or operating expenses, was there? No, there was not. But by agreeing to pick up 47 percent of the Homeowners Association cost, because the sole purpose for the Homeowners Association was to conduct activities that otherwise the city would have to have done. It's as if you're going into a restaurant and saying, well, that glass of milk costs you 10 cents. It probably did. But the person who provides the service of presenting the glass of milk to you, giving you a glass, giving you a restaurant, is going to charge. And nobody would suggest that the real price of the glass of milk or the reimbursement for that glass of milk ought to be the cost as it came off the farm. Well, unless the language – I'm sorry, go ahead. Can you point to the language in the MEXA where the city agreed to pay 40 percent of all the Homeowners Association's costs? That was my question. It would be the agreement, Your Honor, where they agreed to pay 47 percent of the costs. If you go back to the first agreement in June of 1999, it's clear that a Homeowners Association is being established for the sole purpose of establishing, finishing the activities that regard day-to-day maintenance. There's no reason for a Homeowners Association to exist but for these activities. There's a special services area ordinance, in fact, that would have allowed the city to go ahead and do this without the need for a Homeowners Association. And the maintenance couldn't occur without the Homeowners Association. There'd be no mechanism to coordinate both the maintenance and the improvement of the stormwater detention areas, the Page Parkway, the bikeway paths, the monuments, other areas. Well, that may be your argument, but the language of the development agreement and the MEXA really don't in any way help us get to where you say we need to be. Section 4B of the development agreement indicates the city will pay, on behalf of the existing residential development, a proportionate share of the cost of maintaining such wet basins and corresponding landscape areas and then a number of other stormwater detention systems. And then the last line, the city and Cambridge shall enter into an agreement which shall address the procedures for the city to pay its fair and reasonable share of these maintenance items as described below in Section 9. And going on to the language in Section 9, again, these areas, referring to physical areas, the exact areas to be identified by the parties when the cost sharing agreement is approved. Again, the language, these areas share of these maintenance expenses. So the plain language doesn't appear to help you, counsel. May I respond to that? Of course. Your Honor, first, the $217,560 number matches Exhibit B. Why would that number be in there if there wasn't the intent to cover everything? And secondly, Your Honor, the maintenance cannot occur without a homeowner's association. It can't occur. It would be the same as saying that a subcontractor's charge would have to be paid but not a general contractor's if there's an agreement with a general contractor to maintain a street. Thank you, Your Honor. Does your argument turn at whether Exhibit B is your 2A? I mean, if the trial court was, well, I don't know, correct, but it wasn't against the manifest way of the evidence that the trial court's finding that there is no Exhibit B. I mean, does that shoot your argument down a little bit? I mean, does your argument turn on the fact that your 2A is Exhibit B that wasn't actually on the agreement? There's testimony from a number of people who also talk about the behavior of the City of Aurora. There's the question of equitable estoppel and the fact that they acted consistently with the fact that these were included by making payments. And finally, there's a testimony of Mr. Caputo. Mr. Caputo, the City Treasurer, said this was not a mistake. This was an intentional payment. And Mr. De Leon, who testified that, in fact, these bills, which included these contested categories, were reviewed and approved before they were paid. So that would be the only reason. I would add those as well. Didn't you claim that they were a bit frustrated, that you were a bit frustrated, your clients, about paying the bills, so they just helped out and figured they'd pay these two bills? These two years. Your Honor, I don't believe that's what Mr. Caputo said. What Mr. Caputo said was there was a meeting, and there's a question as to when it occurred. Mr. De Leon puts the meeting as early as 1999. Mr. Caputo puts it a little later, but before the payment of the first two bills. There was a meeting which consisted of three parts. Only the middle part involved Mr. Goldsmith. I'm sorry. I've got his name wrong. Counsel for DRH Cambridge. In the before and after, people not involving DRH saw the problem, and Mr. Caputo made a determination that all would be paid, but that he would not tell DRH that, in fact, these were being made as an accommodation only. That was hidden from DRH. It did not come out until 2005, when three things happened. The first thing was Mr. Caputo checked with another person inside the city of Aurora, found out that the build-out was complete, and the maximum benefit that the city could get from these improvements, which is $300,000 a year every year because of the equalized assessed valuation increase of $24 million, had about been realized. They were four houses short. At that point, two letters were written, one by Mr. De Leon, the other, I believe, by Mr. Banbury, who was the Corporation Counsel. And in those letters, they couldn't even agree on what categories were correct and incorrect because Mr. Caputo made a decision to make a payment to hide his real intentions, to induce the city to complete all the work that they wanted done. And this benefited the entire city. Detention ponds, the DuPage Parkway wasn't restricted to these people, and the detention ponds prevented stormwater problems from going to the other parts of the city. When that was done, then a story was made up that these weren't included. But at no time prior to 2005 was that ever mentioned. And the conduct of the people of City of Aurora in reviewing bills, looking at these categories, and making a volitional decision to pay either supports the fact that they should be equitably estopped or supports the fact that, in fact, they knew it was part of it because they paid on it. Can you raise equitable estoppel against a municipality? I believe you can, Your Honor. I don't have a case for you. You'll have additional time, Counsel. Your Honor, thank you. Thank you. Mr. Fessler? May I please report? During your 15 minutes, just so we're straight, you'll have the opportunity to respond to counsel and present arguments on the cross-appeal. Thank you, Your Honor. Justice Shostak, Justice Sinop, Justice Burke, Jim Fessler, on behalf of the defendant, happily cross-appeal with the City of Aurora. Also, Alan Wallen, Howard Jablecki, held to handle the argument. Mr. Bailiff, Mr. Clerk, Counsel. Your Honor, the city respectfully requests that this court reverse that portion of the trial court's order, finding that the city was obligated to pay interest to the plaintiff under the Local Government Prop Payment Act, as well as that portion of the trial court's order, finding that there were no non-prevailing parties, in this case, for the purposes of assessing to attorneys' fees and costs. We also ask that this court affirm the trial court in all other respects. Your Honor, one argument out of the four on appeal was addressed, and that is whether or not the trial court properly found that the MEXA obligated the city to pay only for maintenance expenses and costs. It did not obligate the city to pay for administrative costs or operational costs and expenses, as well as reserves. Your Honor, this document was called a maintenance expense cost-sharing agreement. It was not a maintenance, administrative, operational, and reserve expense cost-sharing agreement. But why did they pay the full amount for the two years? Your Honor, I believe it's as Justice Shostak pointed out. It was as an accommodation. As Mr. Caputo testified, it was a business accommodation. There was a lot of angst. There was a lot of anxiety after they received these two invoices. They didn't believe that they were obligated to pay the seven. They paid it in good faith, and they were going to take up the matter later. As counsel advised, there were letters sent later on that stated, we're not obligated to pay these, and they didn't pay anything after that. The letters were sent in 2005, and they paid them in 2002? It was 2002, I believe. So they waited three years, and then you sent a letter? I guess there was some animosity. It's not in the record, unfortunately, and I do not know the definitive answer to that. But I believe that based on this meeting that occurred, there was angst and there was animosity over these seven categories. What testimony was there at the trial that there was anything else, any other document that was Exhibit B but Plaintiff's 2A, the stabilized budget? There was no evidence that there was no testimony that Exhibit B was, in fact, the Exhibit 2A. As a matter of fact, Mr. Goodman and Mr. Conrad stated that they thought that Exhibit 2A was Exhibit B to the MEXA, but they said that they couldn't definitively state that. They didn't know for a fact, and as a matter of fact, their personal copies didn't have a copy of the Exhibit B attached. Mr. Conrad, at one point in time, I believe it's quoted and I'm going to paraphrase, said, No one seems to know what Exhibit B is. I don't know why. Exhibit B has never been positively identified by any witness. No one knows what it is. No one knows what terms there are. Ms. Belinsky, who created the November 30, 1999 stabilized budget, testified that it was created as a marketing tool to advise potential homeowners of assessments and costs that they may be required to pay. She then stated that there were two subsequent drafts of that document. It was a marketing tool. It was not a document. It was not a document creating the cost sharing. As Your Honors have pointed out repeatedly during Mr. Schmidt's argument, the MEXA itself only identifies five categories of maintenance expenses. It does not identify seven categories of administrative or operational costs, nor does it identify reserves. Likewise, the development agreement, which gave birth to the MEXA, is the same way. It identifies five categories of operational, excuse me, of maintenance expenses to be shared. It doesn't identify any operational costs or expenses. Did the development agreement call for the creation of the Homeowners Association? I believe the development agreement did call for the creation of the Homeowners Association as well. So without that, then they wouldn't have had an administrative expense. But this was not something that was contemplated in the development agreement, where the development agreement sets forth the five maintenance expenses and does not allegate any payment of operational expenses or administrative expenses or costs. That was not contemplated. When they were frustrated and said, hey, these people, there's a lot of angst, let's just pay them for two years, they didn't sit down with them thereafter and say, look, we paid you, but what are all these extra expenses or we have no intent of paying these extra expenses in the future, correct? No, that's correct, Your Honor. They didn't pay it. I believe that the letters were sent a couple years later. Three years later. Yes. So talk to us then about the equitable estoppel theory that your opponent has raised. Your Honor, there is no equitable estoppel theory. It was never presented to this court. Wasn't it listed? It was raised during closing arguments. That is improper to raise equitable estoppel before this court on this appeal when it was simply raised during closing arguments. It can't be here. Besides that, the fact that there is an equitable estoppel argument, it doesn't apply. There was no fraud. There was no misrepresentation. There was nothing that could have caused an equitable estoppel argument to apply in this case. It was raised at closing argument. If anything had been appropriate, it would have been appropriate to make a motion to amend the pleadings to conform to the proofs and then attempt to see what the trial judge ruled at that time. That wasn't done. Simply when closing argument at this bench trial came up, equitable estoppel was raised. That's entirely improper. It's an argument that's waived. It should not be before this court as we've set forth in our briefs and our arguments. But if it's not waived, assuming it's not waived, your position is? There's absolutely no evidence to establish the elements of equitable estoppel, which are virtually identical to the elements of fraud, which Judge Ellsner went through and said, these don't apply. It didn't happen. The position that counsel takes is that Mr. Caputo made representations. Well, you know what? Mr. Caputo can't make representations. Mr. Caputo's an employee. The only person who can act, the only entity that can act on behalf of the city of Aurora is the city council. And the city council has to have matters presented to it for approval and vote and then authorization for signature. But who was representing or who was holding themselves out to Cambridge as those who had the ability and the authority to make these decisions?  The negotiator of the Patrick was Mr. Wyatt. And he was the community development officer for the city of Aurora at the time. And once they had hammered out the development agreement in the MEXA, as is appropriate in municipal operations, I don't know Your Honor's past experiences, so I apologize for that. They had to bring it to the city council. There has to be a resolution or an ordinance passed authorizing the mayor or whatever authorized official to execute something. And in this case, there's absolutely no evidence that any of these people engaged in any kind of a fraud or any kind of a misrepresentation, thereby giving rise to fraud or equitable stoppage. I'm sorry, Your Honor. Who was in the meeting that day when they were discussing, back in 2002 when they were discussing this payment? The invoices? Yes. I believe that the meeting involved Mr. Goldsmith, who was the attorney for the developer, DRH Cambridge. Ironically, Mr. Goldsmith was never called as a witness to testify to the allegedly false statements and misrepresentations. Who was there on behalf of the city? I believe that Mr. Wyatt was at that meeting. I believe that Mr. Caputo, Mr. DeLeon, and beyond that, I am not absolutely certain. Mr. Wyatt may have been there, Your Honor. And so couldn't the Cambridge individuals assume that these were the individuals that are holding themselves out to be in this position where they can negotiate and they're in a position of authority in making these decisions? Couldn't they assume that from the way they conducted themselves at that meeting? Your Honor, I did not research it for this particular case, but with regard to that, you cannot rely, I believe the law in the state is that you cannot rely on that. You have to determine what those people's positions are because the only entity that can bind a unit of local government, such as the city, is the city council. And in this case, Mr. Caputo simply said they went out and they agreed that they were going to pay the two years worth of bills as an accommodation or business accommodation and that they were going to then, they weren't planning to pay the matters that they didn't feel that they were obligated to pay. Before they decided to pay that bill, did they get approval from the city council? The city council would have had to have authorized payment as part of what happens is that a warrant list. Eventually, but that day at the meeting, when they went into the meeting and they talked about it and then they went back in, did they get approval from the city council? Again, Your Honor, that's not a matter of record, but as a matter of understanding. Any bill for payment would have to be submitted with part of the treasurer's report to be paid. It would be part of a warrant list. It would be part of a book outlining hundreds of bills that are actually going to be paid. I don't think that was my question. My question was they went out in the hall, they decided they would pay it, get them off their back because there's a lot of angst over these two year bills. So they went back in and said, okay, we'll pay it. Before they went back in and said, okay, we'll pay it. Did they get approval from the city council to pay it? I know eventually they submitted the bill to the city council. No, Your Honor. They would not have obviously had authority. They did not have approval at that time to have those payments. But they did say that they would pay it. Yes, they would submit that. Correct. If I may move on to the issues on cross appeal. Right. I was going to ask a question about the local prompt government payment act. Yes. And I apologize for going back and forth with my glasses. Oh, that's fine. I'm going to admit that I'm a new bifocal. Don't worry. Assuming that the plaintiff was a contractor because they entered into this contract, Wasn't it the plaintiff's, the developer's job to maintain or keep up the common areas pursuant to this agreement? And therefore, didn't they provide services pursuant to the language of the act? Your Honor, assuming that they were a contractor, which we do not agree with because they simply made the statement that if you enter into a contract, you're a contractor for purposes of local government prompt payment act, we believe that the definition is more expansive than that, that the definition includes erecting buildings, providing goods, providing services, et cetera. So the services. Answering your specific question, Your Honor, there is no evidence of who provided those services. There is no evidence of whether the developer in fact provided those services or the homeowners association in fact provided those services or whether they hired third parties to provide those services. Why would it matter if they hired third parties to provide those services? Do the mowing and keeping up the common areas? Because then the developer in this case or the homeowners association isn't actually providing the services. The city's not paying the bills for the subcontractors for the third parties that are doing the work. That's the contract that would require them, the local government prompt payment act, to kick in. Here you have a cost sharing agreement, a reimbursement agreement. It's kind of like a general contractor, isn't it? I mean, like your opponent said, it's kind of like a general contractor. Yes, but Your Honor, that gets back to the issue of the fact that the city's not in privity of contract with a subcontractor and therefore the city is not paying that subcontractor's bill. But they're in privity of contract with Cambridge, who is the general contractor paying the subcontractor's bill, correct? DRH Cambridge would be the general contractor, correct. But they are not in fact providing the direct service to the city, thereby creating the obligation under the local government prompt payment act. And there's absolutely no evidence in this case as to who provided those services. Doesn't section 9 of that act address or provide for contractors' disbursement of payments from the government to its subcontractor? I'm sorry, Your Honor. Doesn't section 9 of the prompt payment act call for a process of disbursement of funds from the general contractor to its subs when paid by the city? Yes, it does, Your Honor. So why isn't this that? I don't believe that it applies because I believe that this is, well, if I can go back and address the entire argument. Your Honor, there's no dispute that no goods were provided. No dispute whatsoever. The issue is service. And there is absolutely no evidence in this case whatsoever as to who in fact provided those services. The Homeowners Association, we believe, and it's reasonable to infer, hired third parties. Those third parties are not in privity of contract with the city in this case. So if I contract with the city to pick up garbage, and I hire a bunch of independent garbage truck drivers who own their own trucks, and the city is in privity of contract with me, I mean, so then the city doesn't owe me under the prompt payment act, even though I've hired other people to do the job? I don't believe so, Your Honor. I do not believe so. I believe there's a, I think it requires a direct contract between a party to provide services. I think it provides. There's a language right here. Can you point to where that is in the act, that it must be a direct contract between the city and the contractor? I think that's implicit because otherwise you could have situations where the direct service or the direct provision of goods isn't being provided by that general contractor, as you're speaking. And in such a case, the service is being provided for. . . Just go ahead. If I may. The service is being provided by the subcontractor, the third party. The city has no privity with that party. That party is seeking payment from the general contractor. The general contractor is seeking payment from the city, in this case under a cost-sharing agreement. It's a reimbursement agreement. The service is being provided to the general contractor, and the city in this case, in this particular case, is sharing in that. So, if Your Honors have no more questions. Well, I have one other question on the other part of the cross-claim. Let's assume this court were to reverse the trial court on this particular issue. And finds the city was not obligated to pay interest to the plaintiff. Would the plaintiff then be the non-prevailing party, obligated under the MEXA to pay attorney's fees to the city? And if so, why? And discuss the summary judgment ruling for the plaintiff in your answer, please. Absolutely, Your Honor. Your Honor, we believe that if this court ruled in our favor on the Local Government Prop Payment Act issue, that, and regardless of whether this court ruled in our favor on the Local Government Prop Payment Act issue, that we would be the prevailing party. If you keep your voice up, there's a fan on the ceiling. I hear the fan as well. I apologize. Your Honor, we believe that regardless of whether this court affirms or reverses the Local Government Prop Payment Act issue, that we are the prevailing party. That is so because, first of all, the MEXA provides that the non-prevailing party must reimburse the other party for all attorney's fees and costs on issues related to the MEXA. The Local Government Prop Payment Act issue isn't related to the MEXA. It's an ancillary issue. The MEXA issue is, were there five categories that had to be paid, or were there 12 categories that had to be paid? The city prevailed on that issue, and we believe that on that basis alone, we are the prevailing party on the matters relating to the MEXA. You do admit that the city owed some money under this MEXA, correct? Yes, 47 percent for five categories of maintenance costs. That is correct. And the city did not pay a dime in the years 2002, 3, 4, 5, or 6 until this lawsuit was filed. Did the plaintiffs bring a lawsuit in order to force the city to pay some amount? The city hasn't paid a dime in five years, and they get a judgment for payment of 47 percent. Of five categories. And they have to pay your attorney's fees. Tell me how that works out. We didn't dispute that issue. You did. You didn't hide it. That issue is in the answer that was filed and all subsequent pleadings, the city did not dispute the fact that it owed 47 percent for five categories of maintenance. Hold on a second here. It says a prevailing party is one who is successful in any significant issue in the action. The action was, hey, we haven't been paid for five years, pay us for five years. And then they went on a significant part that they got an order that you had to pay them 40 percent of the maintenance costs for the last five years. Well, I think it says Judge Ellsmer and the prior judge that handled the summary judgment motion, I'm sorry, I didn't remember. Judge Kallander. Judge Kallander, who found that these were matters that were not in dispute. These are issues that weren't in dispute. But if they weren't in dispute, then why weren't they paid? The fact that they weren't paid required the Cambridge to have to file a lawsuit, correct? That is correct, Your Honor. And incur attorney's fees. I wish that I had a definitive answer to your question. Unfortunately, I don't know what was going on because it's not in the record during that period of time whether there were negotiations, whether there were conversations, whether there were discussions. That's not a matter. Whether you know why or not, Cambridge had to file a lawsuit and incur attorney's fees in order to be paid. Is that correct? They had to file a lawsuit, and the disputed issue is the seven categories. And the undisputed issue was also a part of that. What you claim now is an undisputed issue. If it was undisputed, why did they have to file a lawsuit? Apparently because they wanted to collect not only for the seven categories that they're maintaining before this court that they're entitled to be paid for, but I understand what you're saying. You're saying that they had to file a lawsuit to collect those five other categories as well. Correct, correct. They did file that lawsuit. The answer was filed. There was no dispute from the city, as Judge Kalander and Judge Ellsner both found. These matters were not in dispute. These matters were matters that the city admitted, agreed, they're set forth in development agreement. Why they didn't pay them after that, I honestly do not know the answer. It doesn't appear in the record. I was not in those meetings. But the fact of the matter is those matters were not in dispute, and those matters, the only matters in dispute were these seven matters. Furthermore, do you want me to continue? Not at this time. Okay. You will have an additional five minutes for rebuttal to the cross-appeal discussion. Thank you, Your Honor. Thank you, Counselor. Mr. Schmidt? Your Honor, thank you. You have ten minutes. Your Honor, I looked back at the materials that the Court expressed an interest in my looking at, and I found four be in development agreement, but that talks about items relating to the maintenance of the wet bases. The other answer I would have for the Court is that the maintenance expense cost sharing agreement talks about sharing of the cost. The cost is the total amount necessary to deliver the obligation that DRH and now actually the Homeowners Association, a successor, took on. Some other matters briefly, Your Honor, they did not agree. At the motion for summary judgment, my opponents fought it, and in fact, if you look at the report on proceedings, they in fact stated that even if it was found by Judge Kalander that all the amounts were in fact owed, they said that a constitutional prohibition of using public funds for a private purpose would invalidate the contract altogether. They withdrew that eventually, though, didn't they? Your Honor, it wasn't even on file at that point. They argued it. Judge Kalander said you might want to plead it. That becomes important later when it talks about them getting a set-off. But they then file an affirmative defense, and that stays on file until trial, until after trial begins. It's not withdrawn until trial actually begins. With regard to the Local Government Prompt Payment Act, quickly, Jose de Leon identified the Cambridge Countryside Homeowners Association as a vendor. Mr. Caputo testified that where there's a general contractor-subcontractor relationship or things like that, it would be the general contractor that would be the contractor. We have a vendor number. We were given a vendor number, and we were paid as a vendor. We were given a- Is that dispositive, the fact that you were given a vendor number? It's not- Isn't that maybe just a quick look at that as a housekeeping step? Mr. de Leon was asked whether or not it was just done because there was no other way to do it, and there wasn't that indication. With regard to the bills themselves, they did go through City Council approval, and I believe you'll find that in the records. If you look at the exhibits, I believe they're stamped and approved. Unless Your Honor has any more questions about Exhibit 4, the 4B question, there were two other matters that I wanted to address. Are you going to speak to attorneys, please? I can speak to whatever the Court would like me to speak to. Go ahead on your issues. The next point I was going to make, Your Honor, was whether the fraud-directed finding was against the manifest weight of the evidence. In terms of the observation made that equitable estoppel was not pledged, it was argued, Your Honor, and more importantly, there was no objection made during that argument. In addition, equitable estoppel and fraud are really, although not identical, two sides of the same coin. They have about the same elements. They go about it the same way. And the question is whether or not the Court first conducted the proper analysis on what he called a directed verdict, which I believe with respect ought to have been a motion for judgment. In a best trial, I don't believe directed findings are done. It's a motion for judgment. But the two-step process is was there a prima facie case, and then are there evidentiary questions that call for a weighing? And in this case, when the Court made its decision, the Court talked about two and only two elements. There wasn't an item-by-item recitation. If you go back and look at the evidence, I believe there was a prima facie case made, and the Court never got to the weighing evidence. And, in fact, in his closing, I'm sorry, in his judgment order, there's no indication that he found any witness incredible. A statement of a material nature, and there can be statement by conduct in the equitable estoppel area. The Getty's case addresses that. Mr. Caputo made a payment, didn't tell anybody that that payment was going to be the single and only payment, and by his conduct, indicated that everything was fine with the bill. It wasn't paid under protest. It wasn't paid under reservation. Let's stick to the fraud. What was the statement? Tell us what the statement was of the misconduct. It was actually a statement by conduct in making a payment without indicating that it was being paid under protest and without any intention of continuing to make payments. So it's fraud by omission. That would be one way to describe it, Your Honor. But isn't that because there was a dispute over whether there were additional items that shouldn't have been in that payment? No, Your Honor, because until 2005, there was no claim made that there was a dispute. But there were e-mails back and forth, or at one point, wasn't the city going to take over the maintenance itself? Weren't there some indications that there was some dissatisfaction with this arrangement? There is an e-mail, and I think it goes to their overall scheme, which was to get these items improved. Stormwater detention had to be improved. Depeche Parkway was a mess. The bike path had to be done. And once they got that done, and note again, Mr. Caputo checks in early 2005 and finds out that the build-out is just about complete and the maximized EAV has been realized. Then and only then is there a complaint made about the categories. Prior to that, there was a single e-mail asking whether or not the city could take it over. And indeed, if they did, then they'd be able to charge the members of this area $1.18 per $100 of assessed valuation to maintain it. So the scheme is, get this built. By omission, fail to tell the people who have invested hundreds and millions of dollars in developing this area that their scheme is to get it built and then to take it away from them. Don't do that taxpayer expense. And then tax the members of the area. The special services area is coextensive with the homeowners association. But there wasn't any suggestion of a complaint. And when the complaint started, were they consistent or were they not? Mr. Daly and Mr. Banbury did not even agree in their two letters, which I think came in February and April of 2005, on what the problem categories were. Going on, was the statement untrue? Yes. They had no intention of paying. Mr. Caputo, page 2959 of the record. Made to induce reliance? Yes. It was made to induce the completion of the general, the common areas that benefited the entire city. Stormwater detention especially. Those detention ponds and restrictors, the entire city of Aurora has benefited from them. Does the plaintiff's predecessor, DRH, rely? Of course they do. They bill that. And do they do it to their detriment? Yes. By 2005, they've incurred expenses. They've created a homeowners association which has as its only purpose these items. There is not a clubhouse. There are not common walls. This is a subdivision which has a homeowners association. There's nowhere even to meet. We meet in a house when we need to. Gettys indicates that it can be silenced. So it's against the manifest way of the evidence because there is no evidence that supports anything except the truthfulness of the six elements that were established not by our personnel but by Mr. Caputo and Mr. De Leon. In terms of the local government prompt payment act, I believe I already addressed the court on the matters that I want to. And I'm sorry, Your Honor had asked me to talk about. Attorney, please just briefly your position. Who is the non-prevailing party? And I think Your Honor has put her finger on it. And the best case is the Peloton case. The language of the agreement says that the non-prevailing party shall pay the other party attorney's fees. So the question is, is someone non-prevailing? And as the court pointed out, Justice Berg, if you prevail on a substantial amount or on some substantial portion, then you would be a prevailing party, the opposite of which would be a non-prevailing party, and you wouldn't qualify. In this circumstance, it's especially important again to note that this was a hard-fought case and that until we were on trial, there was not a concession that the contract was valid. It was not until trial had already started that counsel representing the city dropped their affirmative defense, which they had filed by that time, claiming that the constitutional prohibition of using public funds for a private purpose wouldn't have invalidated the contract completely. So far from agreeing at the beginning, their defense and denials continued until the trial court began proceedings at the trial itself. Are there any questions that the court would have at this point? So you think the trial court then was correct on this point? I believe, Your Honor, as we with respect disagree with this ruling, but we do believe that each party, when analyzed, would not qualify as a non-prevailing party. Okay. The only other question, or the only other issue that I would raise briefly with the court, because my time is just about up, is the third point that the threats to award attorney's fees represented an impermissible attempt to coerce a settlement and therefore deprived us of a fair and impartial tribunal by denying us procedural due process. The best case, Your Honor, I think is the K4 Enterprises case. It incorporates some of the federal cases that we also cited in our brief. And the question is whether or not the trial court was threatening to penalize a party who refuses to settle. And I believe that was indeed the case. In these circumstances, and again, at the beginning of the case, the question of whether or not there was a dispute became prominent in Judge Ellsner's thinking. Judge Ellsner did not handle the motion for partial summary judgment. There was not an agreement. In fact, there are hundreds of pages showing that that was vigorously disputed. And the court finding that, in fact, there was no real dispute does not mean that the city's attorneys did not get up and raise vociferously the dispute. Nor does it eliminate the observation they made at the end of that argument that they would in any event claim constitutional prohibition on contracts of this type. Thank you. Thank you, Your Honor. Thank you very much, counsel. At this time, Mr. Schmidt, you have five minutes to- Is Mr. Fessler there? I'm sorry. I'll turn my page over to Mr. Fessler. Excuse me. Your Honor, I will attempt to be brief. The points that were raised that I can address. Mr. Schmidt first brought up the fact that the motion for summary judgment was disputed. Yes, it was disputed, but it was not disputed on the fact of the five categories of payment or the 47%. It was disputed on the constitutionality of- Keep your voice up. Constitutionality of making- Let me repeat that. The motion for summary judgment was disputed. There's no question about that, but the fact- The obligation to pay five categories of maintenance expenses at 47% was not disputed. There were other issues on summary judgment that were disputed. With regard to Mr. De Leon's testimony regarding the vendor number, Judge Zinoff, I believe that you put it quite well. You said it was a housekeeping matter. The City of Aurora identifies every payee, every payee in the City of Aurora with a vendor number. That doesn't make somebody a vendor for purposes of the Local Government Prop Payment Act. It's a matter of form over substance because the definition of a vendor is one who vends or sells. Just because you're identified on a form doesn't make you a vendor. Okay? Mr. Schmidt brought up the improper analysis that the judge applied in entering a directed verdict. As cited in my brief and extensively discussed, the cases say that this is not a fatal issue. In fact, in this case, the standard of review is the same for both. It's de novo. So that's not a fatal issue. With regard to the fraud, as Judge Ellsner said, this was not fraud. It was a legitimate dispute between the parties. I need to point out to the Court the desperation that counsel has to try to make this a fraud case. In their complaint, they allege that the fraud is that the City never intended to pay 47 percent of the five categories and lulled them into this contract. Well, when they were ruled against because the City did pay at least two years of 47 percent for five categories, the argument is now Mr. Caputo decided before the MEXA was entered into that they were only going to pay two years and that they weren't going to pay anything after that. Mr. Caputo had nothing to do with the maintenance expense cost-sharing agreement. The testimony is he didn't negotiate it, he didn't draft it, he didn't participate in it. He didn't know about it until the two invoices came in, and these conversations occurred after the invoices came in. So there's no way that Mr. Caputo could have made false statements prior to the execution of the MEXA, as counsel asserts. And it's just ridiculous the efforts to try to pit this into fraud, and when the fraud didn't work, we raised equitable estoppel in the closing argument. That's clearly what's going on here. With regard to these threats, there were no threats, Your Honors. This was simply Judge Elsner summarizing this case, discussing this case, and as I pointed out ad nauseum in my brief, if you look at it, Mr. Schmidt agreed to discuss settlement. He told Judge Elsner that he understood that he could differentiate between things, that he was a good judge, and that the settlement was a good idea. He said, you know, Your Honor, if we can get reserves out of here, we might be close, we can get this thing taken care of. I'm paraphrasing now, but it's all set forth in the brief. He participated in this. For him to come now and say that these were threats by the judge to settle this or he was going to take action, is just absurd, and not only is it absurd, he's waived them, because he's induced the error that he's claiming now, and he's brought that error on himself. We've cited this in the brief. Your Honors, I thank you for your time, and unless you have any further questions, I will step down. Thank you so much for your time. Thank you, Counsel. At this time, the Court will take the matter under advisement and render a decision in due course.